## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE
## WESTERN DIVISION

| | | |
|---|---|---|
| EVEREST NATIONAL | : | |
| INSURANCE COMPANY, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | CIVIL ACTION NO. 2:16-cv-2388 |
| | : | |
| GAVION, LLC., MILES S. FORTAS, | : | |
| BRIAN L. JONES, and | : | |
| ROBERT A. LONGFIELD, JR., | : | |
| | : | |
| Defendants. | : | |

## COMPLAINT FOR DECLARATORY JUDGMENT

Plaintiff, Everest National Insurance Company ("Everest"), by and through its counsel, files this Complaint for Declaratory Judgment against Defendants, Gavion, LLC ("Gavion") and Miles S. Fortas ("Fortas"), Brian L. Jones ("Jones) and Robert A Longfield, Jr. ("Longfield") (collectively the "Individuals"), and alleges as follows:

### NATURE OF THE ACTION

1.     This is an insurance coverage dispute in which Everest seeks a judicial declaration that it has no obligation to provide the Defendants with insurance coverage under Investment Management Professional Liability Policy No. FL5ML00139-151 ("Policy") which Everest issued to Gavion for the period of October 1, 2015 to October 1, 2016.  A true and correct copy of the Policy is attached hereto as Ex. A.

2.     Gavion and the Individuals seek coverage from Everest under the Policy in connection with allegations against them in an action pending in the United States District Court

for the Middle District of Louisiana, captioned *Firefighters' Retirement System, et al. v. Citco Group Limited, et al.*, Civil Action No. 3:13-CV-00373 ("Underlying Action").

3.     The Underlying Action was initiated in March 2013 by the administrators of three Louisiana pension funds (the "Underlying Plaintiffs") seeking to recover $100 million they allegedly lost following an investment in FIA Leveraged Fund ("Leverage Fund"), a company that acted as a feeder fund in a "master/feeder" structure.  One of the defendants in the Underlying Action, Consulting Services Group, LLC ("CSG"), allegedly provided investment advice to the Underlying Plaintiffs in connection with the investments they made in the Leverage Fund.

4.     The Underlying Plaintiffs recently brought a Counterclaim against Gavion and the Individuals, alleging that on or about September 2013, CSG fraudulently transferred its assets to Gavion with the intent to avoid payment obligations to its creditors.  They allege that Gavion was co-founded by Fortas, Jones and Longfield, who were former executives of CSG, for the sole purpose of allowing CSG to continue operations while avoiding its debts.  They assert that Gavion violated the Tennessee Uniform Fraudulent Transfer Act and that the Individuals, as directors of both CSG and Gavion, breached fiduciary duties allegedly owed to the Underlying Plaintiffs as creditors of CSG.

5.     Gavion and the Individuals tendered the claims against them in the Underlying Action to Everest.  Pursuant to certain terms, exclusions and conditions of the Policy, Everest properly disclaimed coverage.  *See* Denial Letter, attached hereto as Ex. B.  The various reasons in support of Everest's denial of coverage are provided in detail therein.  By way of one example, however, the Policy only provides coverage for a **Claim** made during the **Policy Period** for a **Wrongful Act** committed <u>on or after</u> the **Continuity Date**, defined in the Policy as October 1, 2013.  All of the alleged conduct that forms the basis for the claims against the Defendants in the

Underlying Action took place a month <u>prior to</u> the Policy's **Continuity Date** in September 2013, thereby falling outside the scope of coverage afforded by the Policy.[1]

6.      Accordingly, Everest seeks a declaration that it has no duty to pay any amounts to Defendants for the claims asserted against them in the Underlying Action.

## THE PARTIES

7.      Plaintiff Everest is a corporation organized under the laws of Delaware with its principal place of business located in Liberty Corner, New Jersey.

8.      Defendant Gavion is a limited liability company organized and existing under the laws of Delaware with its principal place of business located in Memphis, Tennessee.

9.      Upon knowledge, information and belief, Defendant Fortas is an individual residing in Memphis, Tennessee.

10.     Upon knowledge, information and belief, Defendant Jones is an individual residing in Germantown, Tennessee.

11.     Upon knowledge, information and belief, Defendant Longfield is an individual residing in Cordova, Tennessee.

## JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1332(a)(1), as diversity of citizenship exists between Everest (a Delaware corporation with a New Jersey principal place of business) and Gavion, a limited liability company whose members, including Fortas, Jones and Longfield, are domiciled in the State of Tennessee.  The matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

---

[1] All bolded terms are defined in the Policy.

13.     This Court has personal jurisdiction over Gavion and the Individuals because, at all relevant times, including as of the date of the commencement of this action, the Defendants have resided in Tennessee and/or maintained their principal place of business in Tennessee, and transacted business in this judicial district.

14.     Venue is proper in this judicial district pursuant to 28 U.S.C. §1391(a)(2) because a substantial part of the events or omissions giving rise to this dispute occurred in this judicial district.

15.     An actual case and controversy of a justiciable nature, pursuant to Article III of the United States Constitution and 28 U.S.C. §§ 2201 and 2202, exists between the parties.

16.     This case and controversy is ripe for adjudication, and involves the rights, liabilities and legal relations of the parties under a contract of insurance Everest issued to Gavion.

17.     There is a real and substantive controversy between Plaintiff and Defendants involving adverse legal interests, of sufficient immediacy and reality to warrant a judicial determination and the issuance of a declaratory judgment.

18.     A judgment in this action will serve a useful purpose in clarifying and settling the legal relations of the parties and the instant controversy may be resolved by a judgment in this action without the necessity of joinder of any other parties.

## THE UNDERLYING ACTION

19.      The Underlying Action was initiated by a Petition for Damages filed in Louisiana state court in March 2013 by Firefighters' Retirement System, Municipal Employees' Retirement System and the New Orleans Firefighters' Pension and Relief Fund ("Underlying Plaintiffs"), who

are the administrators of pension funds.  *See* Petition for Damages, attached hereto as Ex. C, ¶ 1.[2]
In June 2013, the case was removed to the United States District Court for the Middle District of
Louisiana, captioned *Firefighters' Retirement System, et al. v. Citco Group Limited, et al.*, Civil
Action No. 3:13-CV-00373.

20.     The Underlying Plaintiffs allege they collectively lost $100 million they invested
in FIA Leveraged Fund ("Leverage"), a Cayman Islands company formed primarily to invest in
another Cayman Islands company, Fletcher Income Arbitrage Fund, Ltd. ("Arbitrage"), in what
constituted a "master/feeder" investment structure.  *Id.* at ¶¶ 10, 13, 34.

21.     Among the various defendants named in the Underlying Action, it is alleged that
Consulting Services Group, LLC ("CSG") was the investment advisor to the Underlying Plaintiffs
and in 2008, advised them in connection with their investment in Leverage.  *Id.* at ¶¶ 14, 15.

22.     It is alleged that in March 2008, an employee of CSG, along with representatives
of other defendants, solicited the Underlying Plaintiffs to invest in Leverage by purchasing a new
series of shares designated as the "Series N shares" for the purchase price of $100 million.
Underlying Plaintiffs assert that, as holders of the Series N shares, they were guaranteed a return
of 12% per annum.  *Id.* at ¶¶ 19, 22, 32.

23.     Underlying Plaintiffs allege that despite representations to the contrary, Leverage
was invested in illiquid investments, no new investments were made or assets purchased by the
funds from Underlying Plaintiffs' purchase of Series N shares, and substantially all of the funds
invested by them were used to fund the redemptions of other investors, which was the primary
purpose of the Series N share offering.  *Id.* at ¶35.

---

[2] The references to the Underlying Action are based upon the allegations in the Underlying Action.  Everest
expresses no view as to the truth of the allegations in the Underlying Action.

24.     Beginning in March 2011, Underlying Plaintiffs allegedly requested the redemption of Series N shares which Leverage failed to pay.  As a result, Underlying Plaintiffs allege they suffered a loss in the amount of the $100 million purchase price of the Series N shares.  *Id.* at ¶¶ 42, 43, 45.

25.      In addition to CSG, the Underlying Plaintiffs sued the investment manager and administrators of Leverage and Arbitrage, the auditor of the financial statements of Leverage and Arbitrage, and various other related entities and individuals.  They allege counts for violations of the Louisiana Securities Act, third party beneficiary claims, unjust enrichment, breach of contract, negligent misrepresentation, unfair trade practices and holder claims.  *Id.* at ¶¶ 102-312.  They seek to recover their $100 million investment in addition to "consequential, incidental and special damages, lost profits, lost opportunities and other economic damages **and attorney fees**."  *Id.* at ¶ 313 (emphasis in original).

26.     The Petition for Damages was amended twice, removing certain counts against CSG and adding counsel for Leverage as a defendant.  *See* First and Second Amendments to Petition for Damages, attached hereto as Ex. D.

27.     On April 21, 2016, the Underlying Plaintiffs filed their Answer, Affirmative Defenses and Counterclaim ("Counterclaim") to the Amended Affirmative Defenses to Petition for Damages and Counterclaims of CSG and another defendant.  In addition to CSG, the Counterclaim names Gavion, Fortas, Jones and Longfield as defendants.  *See* Counterclaim, attached hereto as Ex. E.

28.     In their Counterclaim, Underlying Plaintiffs allege that CSG "suffered a number of setbacks" beginning in 2007, including investigations, examinations, lawsuits and negative publicity.  CSG's regulatory and legal issues allegedly "continued to snowball" until "at some

point soon after March 2, 2013" the executive management committee, comprised of Fortas, Jones and Longfield, "decided to cease operations under the CSG umbrella and begin a new firm called Gavion, LLC" which they co-founded.  *Id.* at ¶¶ 59-62, 75.

29.     Gavion allegedly provides investment advice and was co-founded by Fortas, Jones and Longfield, former executives of CSG.  It is further alleged that Gavion registered with the SEC and made its initial filing with the Tennessee Secretary of State in June 2013.  *Id.* at ¶¶ 63-64.

30.     On or about September 2013, CSG "transferred virtually all of its assets to Gavion in an effort to provide a fresh start for Fortas, Longfield and Jones, and the funds that were previously managed by CSG."  It is alleged the transfer was made "with full knowledge that the [Underlying Plaintiffs] were a potential creditor of CSG for the amount of judgment that will be rendered against CSG as a result of the [Underlying Action]."  The transfer of CSG's assets to Gavion was allegedly made "without reasonably equivalent value and was not consummated in good faith."  *Id.* at ¶ 66.

31.     It is alleged that CSG transferred its assets to Gavion in September 2013 "knowing that its assets would be the subject of creditor claims once numerous lawsuits, including the claim asserted by the [Underlying Plaintiffs] herein, were resolved or reduced to judgment."  *Id.* at ¶ 72. The transfer of assets was allegedly done "in an effort to shutter the business of CSG and get out from the cloud of allegations and legal troubles that continued to plague CSG… This fraudulent transfer was executed with the intent to avoid having to pay the [Underlying Plaintiffs] the $100 million that CSG is indebted to the [Underlying Plaintiffs]."  *Id.* at ¶ 73.  The fraudulent intent of the transfer was allegedly evidenced by, among other things, CSG receiving "no, or minimal consideration for the transfer to Gavion."  It is further asserted that "CSG and Gavion shared an extremely close relationship, namely the executive committee of CSG's parent company were the

founders of Gavion."  Underlying Plaintiffs contend that the transfer of CSG's assets to Gavion in September 2013 "constituted an effective liquidation of CSG, which led to the complete cessation of CSG's business."  *Id.* at ¶ 75.

32.     Count one of the Counterclaim is directed at CSG and Gavion and alleges violation of the Tennessee Uniform Fraudulent Transfer Act as a result of the September 2013 transfer of assets from CSG to Gavion.  *Id.* at ¶¶ 69-77.

33.     The Underlying Plaintiffs also brought a second Count directed against Fortas, Jones and Longfield for breach of fiduciary duty.  They allege that they owed a fiduciary duty as of March 2013 when the Underlying Plaintiffs filed their Petition for Damages and became a creditor of CSG, asserting that "as directors of both CSG and Gavion" they "knowingly violated their fiduciary duties to the [Underlying Plaintiffs], as creditors of CSG, by allowing, and in fact authorizing, the transfer of virtually all of CSG's assets to Gavion."  *Id.* at ¶ 80.

34.     It is further alleged in support of Count Two that Fortas, Jones and Longfield "who made up the executive committee of CSG, knew or should have known that the transfers CSG was making to Gavion would leave CSG with an unreasonably small amount of assets that would not allow CSG to continue operations and would prevent CSG from having the assets necessary to pay its debts as they matured, including the $100 million CSG owed to the [Underlying Plaintiffs]."  *Id.* at ¶ 81.

35.     Through their Counterclaim, the Underlying Plaintiffs seek to hold Gavion liable to them "for their transfer and receipt of assets" and Fortas, Jones and Longfield "jointly and solidarily liable for the fraudulent transfers of CSG and Gavion…."  *Id.* at ¶¶ 77, 82.

36.     On April 21, 2016, Underlying Plaintiffs filed a Motion for Leave to File Third Amended Complaint, attaching a Third Amended Complaint as an exhibit to the motion.  *See* Third

Am. Compl., attached hereto as Ex. F.  In their Third Amended Complaint, Underlying Plaintiffs incorporate by reference the allegations against Gavion and the Individuals set forth in their Counterclaim and assert they are liable for their $100 million investment in the Leverage Fund plus accrued interest.  *Id.* at ¶¶ 3-5.

## THE POLICY

37.     Everest issued Investment Management Professional Liability Policy No. FL5ML00139-151 to Gavion, the **Named Insured**, for the one year policy period of October 1, 2015 to October 1, 2016.  The aggregate Limit of Liability of the Policy is $5 million, subject to a $250,000 Insured Entity Retention.  *See* Ex. A, Declarations.

38.     The Everest Policy provides insurance coverage under two parts: "Coverage A- Investment Advisor Professional Services" and "Coverage C- Investment Advisor Management Liability."  While the Policy also contains "Coverage B", Gavion elected not to purchase it.  *Id.*, Declarations, ITEM 4.  The Policy also states that "The Insurer does not assume any duty to defend any Claim under this policy."  *Id.*, Section VI - DEFENSE, SETTLEMENT AND ALLOCATION, A.

## COUNT I
## DECLARATORY JUDGMENT THAT THE INSURING AGREEMENTS
## UNDER THE POLICY ARE NOT TRIGGERED

39.     Everest incorporates by reference paragraphs 1 through 38 as though set forth herein at length.

40.     Everest is entitled to a declaration that no coverage is available under either "Coverage A" or "Coverage C" of the Policy because the allegations in the Underlying Action fail to satisfy the requirements of those insuring agreements.

**Coverage A – Investment Advisor Professional Services**

41.     Under "Coverage A," Everest's potential obligation to provide coverage is limited to "all **Loss** resulting from any **Claim** first made against the **Insured** during the **Policy Period**… for a **Wrongful Act** committed on or after the **Continuity Date**, solely in the performance of or failure to perform **Investment Advisory Professional Services**."  Ex. A, Section I - INSURING AGREEMENTS.

42.     With respect to "Coverage A," a **Wrongful Act** is "any actual or alleged error, misstatement, misleading statement, neglect or breach of duty, omission or act by an **Insured** solely in the performance of **Investment Advisory Professional Services.**"  Ex. A., Section II, Z.

43.     **Investment Advisory Professional Services** "means activities performed by an **Investment Advisor** for or on behalf of a client in connection with providing financial, economic or investment advice, or the performing of investment management services, for monetary consideration pursuant to a written contract between such client and an **Investment Advisor** defining the scope of such activities."  Ex. A, Section II, N.  It also "means the provision of computer and Internet services, administrative services, and publications prepared or written by any Insured, provided such services are performed in connection with the Insured's financial or investment operations; or the selection, oversight and direction by any Insured Person or Insured Entity performing Investment Advisory Professional Services on behalf of the Insured."  Ex. A., Endorsement No. 3.  The **Continuity Date** is October 1, 2013.  Ex. A., Declarations, ITEM 8.  The **Insured** under "Coverage A" means an **Investment Advisor**, defined to include Gavion, but not the Individuals.  Ex. A., Section II, C., M.

44.     In the Underlying Action, plaintiffs allege that in September 2013 Gavion fraudulently participated in the transfer of the assets of CSG in order for CSG to avoid its

obligations to plaintiffs as creditors of CSG, thereby violating the Tennessee Uniform Fraudulent Transfer Act.  Those allegations do not satisfy the threshold definitions of a **Wrongful Act** in "Coverage A" of the Policy because they do not constitute acts or omissions by Gavion solely in the performance of **Investment Advisory Professional Services.**  The allegedly fraudulent transfer of assets with the intent to avoid debts owed to the Underlying Plaintiffs does not constitute activities performed by Gavion for or on behalf of a client in connection with providing financial, economic or investment advice, or the performing of investment management services.  Nor do those allegations implicate the additional definition of **Investment Advisory Professional Services** pursuant to Endorsement No. 3.  Thus, the allegations in the Underlying Action fail to satisfy the basic requirements of the insuring agreement necessary to trigger any potential coverage obligations pursuant to "Coverage A" of the Policy.

45.   Even assuming the allegations in the Underlying Complaint constituted a **Wrongful Act**,  the insuring agreement in "Coverage A" requires that the **Wrongful Act** also be committed on or after the October 1, 2013 **Continuity Date**.  The alleged fraudulent transfer of the assets of CSG, which is the sole basis for the alleged liability of Gavion in the Underlying Action, took place in September 2013.  Thus, the allegations in the Underlying Action also fail to satisfy the essential requirement of the insuring agreement that any alleged **Wrongful Act** take place on or after October 1, 2013, which is necessary to trigger any potential coverage obligations under "Coverage A" of the Policy.

46.   Accordingly, Everest has no obligation under "Coverage A" of the Policy to pay any **Loss** to Gavion or the Individuals for the claims against them in the Underlying Action.

## Coverage C – Investment Advisor Management Liability

47.      "Coverage C" of the Policy contains three parts.  None of those parts are triggered by the allegations in the Underlying Action.

48.      Part one of "Coverage C" states that Everest will pay: "An **Insured Person** of an **Investment Advisor** all **Loss** incurred by the **Insured Person** resulting from a **Claim** first made against the **Insured Person** during the **Policy Period**… for a **Wrongful Act** committed by the **Insured Person** on or after the **Continuity Date**, in their capacity as such with the **Investment Advisor**, except to the extent that the **Investment Advisor** has indemnified the **Insured Person** for such **Loss**."  *See* Ex. A., Section I - INSURING AGREEMENTS, Coverage C (1).

49.      Part two of "Coverage C" states that Everest will pay an **Investment Advisor** all **Loss** incurred by the **Insured Person** for which the **Investment Advisor** indemnifies the **Insured Person** and which results from a **Claim** first made against the **Insured Person** during the **Policy Period**…for a **Wrongful Act** committed by the **Insured Person** on or after the **Continuity Date**, in their capacity as such with an **Investment Advisor**."   Ex. A., Section I - INSURING AGREEMENTS, Coverage C (2).

50.      With respect to "Coverage C" parts one and two, a **Wrongful Act** means "any actual or alleged error, misstatement, misleading statement, neglect or breach of duty, omission or act" by an **Executive**, **Employee** or **Investment Advisor** in their capacity as such.  Ex. A, Section II - DEFINITIONS, D., G., H., J., M.  F., Z (3).

51.      Part three of "Coverage C" of the Policy states, in relevant part, that Everest will pay all **Loss** incurred by it "resulting from a **Claim** first made against the **Investment Advisor** during the **Policy Period**…for a **Wrongful Act** committed by the **Investment Advisor** on or after the **Continuity Date**…."  Ex. A., Section I - INSURING AGREEMENTS, Coverage C (3).

52.     With respect to "Coverage C" part three a **Wrongful Act** means "any actual or alleged error, misstatement, misleading statement, neglect or breach of duty, omission or act."  Ex. A, Section II - DEFINITIONS, Z. 4.

53.     With respect to "Coverage C" parts one and two, the sole basis for the alleged liability of the Individuals is their breach of fiduciary duties to the Underlying Plaintiffs while Directors of both CSG and Gavion as a result of the transfer of the assets of CSG to Gavion in September 2013.   Thus, even assuming the Individuals constitute **Insured Persons** and the allegations in the Underlying Action constitute a **Wrongful Act**, the allegations still fail to satisfy the essential requirement of the insuring agreement that any alleged **Wrongful Act** take place on or after October 1, 2013, which is necessary to trigger any potential coverage obligations under "Coverage C" parts one and two of the Policy.

54.     Similarly, with respect to "Coverage C" part three, the sole basis for the alleged liability of Gavion is the allegedly fraudulent transfer of the assets of CSG to Gavion in September 2013.  Thus, even assuming the allegations in the Underlying Action constitute a **Wrongful Act**, the allegations still fail to satisfy the essential requirement of the insuring agreement that any alleged **Wrongful Act** take place on or after October 1, 2013, which is necessary to trigger any potential coverage obligations under "Coverage C" part three of the Policy.

55.     Accordingly, Everest has no obligation under "Coverage C" of the Policy to pay any **Loss** to Gavion or the Individuals for the claims against them in the Underlying Action.

## COUNT II
## <u>DECLARATORY JUDGMENT AS TO POLICY EXCLUSIONS AND CONDITIONS</u>

56.     Everest incorporates by reference paragraphs 1 through 55 as though set forth herein at length.

13

57.     Endorsement No. 2 to the Policy is entitled "PRIOR ACTS EXCLUSION" and states the following:

It is agreed that the **Insurer** will not pay for any **Loss** under this Policy resulting from any **Claim** based upon, attributable to or arising out of:

1. any **Wrongful Act** actually or allegedly committed or attempted by an **Insured** on or prior to October 1, 2013; or

2. any subsequent **Wrongful Act** which, together with a **Wrongful Act** described in (1) above, constitute **Interrelated Wrongful Acts.**

58.     **Interrelated Wrongful Acts** are defined under the Policy as "all **Wrongful Acts** that have as a common nexus any fact, circumstance, situation, event, transaction, cause or series of related facts, circumstances, situations, events, transactions or causes."  Ex. A., Section II - DEFINITIONS, O.

59.     The sole basis for the claims against Gavion and the Individuals in the Underlying Action is the allegedly fraudulent transfer of the assets of CSG to Gavion in September 2013. Even assuming the alleged conduct constitutes a **Wrongful Act**, the **Claim** against the Defendants for which they seek insurance coverage is based upon, attributable to or arises out of a **Wrongful Act** actually or allegedly committed or attempted on or prior to October 1, 2013.  Likewise, even if any of the alleged conduct constitutes a **Wrongful Act** and is determined to have occurred after October 1, 2013, it constitutes an **Interrelated Wrongful Act** and falls within the scope of the exclusion because it has a common factual nexus with the alleged fraudulent transfer of assets in September 2013.  Accordingly, even assuming all other terms and conditions of the Policy are satisfied, coverage for the claims against the Defendants in the Underlying Action is barred by the Prior Acts Exclusion of the Policy.

60.     The Policy contains an exclusion stating that Everest will not pay for any **Loss** under any Insuring Agreement resulting from any **Claim** against an **Insured** "[b]ased upon,

attributable to, or arising out of a **Wrongful Act** or **Interrelated Wrongful Act** that occurred before the **Continuity Date**." Ex. A., Section III - EXCLUSIONS, A. 3.

61.    The sole basis for the claim against the Defendants in the Underlying Action is the allegedly fraudulent transfer of the assets of CSG to Gavion in September 2013, prior to the October 1, 2013 **Continuity Date**. Accordingly, even assuming all other terms and conditions of the Policy are satisfied, coverage for the claims against the Defendants in the Underlying Action is barred by Exclusion A. 3. of the Policy.

62.    The Policy contains an exclusion stating that Everest will not pay for any Loss under any Insuring Agreement resulting from any **Claim** against an **Insured** "[b]ased upon, attributable to, or arising out of any demand, suit, or other proceeding against any **Insured** which was pending on or existed prior to the **Continuity Date**, or arising out of the same or substantially the same facts, circumstances or allegations which are the subject of, or the basis for, such demand, suit, or other proceeding." *See* Ex. A., Section III - EXCLUSIONS, A. 6. Accordingly, even assuming all other terms and conditions of the Policy are satisfied, coverage is barred under this exclusion to the extent the claims against the Defendants in the Underlying Action are based upon, attributable to, or arise out of any demand, suit or other proceeding against the Defendants that was pending or existing prior to October 1, 2013 or arise out of the same facts, circumstances or allegations which are the subject of, or the basis for, such demand, suit, or other proceeding.

63.    The Policy contains an exclusion stating, in relevant part, that Everest will not pay for any **Loss** under any Insuring Agreement resulting from any **Claim** against an **Insured** "[b]ased upon, attributable to, or arising out of… the gaining of any profit, remuneration, or advantage to which the **Insured** was not legally entitled; or… Any criminal or deliberately fraudulent act, error or omission by the **Insured**…if evidenced by any judgment or final adjudication in any

proceeding.  Ex. A., Section III - EXCLUSIONS, A. 1.  Accordingly, even assuming all other terms and conditions of the Policy are satisfied, coverage is barred under this exclusion to the extent any final judgment or adjudication against the Defendants in the Underlying Action evidences they gained any profit, remuneration, or advantage to which they were not legally entitled or engaged in any criminal or deliberately fraudulent act, error or omission.

64.     The Policy contains an exclusion stating, in relevant part, that Everest will not pay for any **Loss** under Coverage C.3, "for contractual liability of the **Insured Entity** under any express written contract or agreement, or for liability of others assumed by the **Insured Entity** under any oral, written or implied contract or agreement; however, this exclusion does not apply to the extent that the **Insured Entity** would have been liable in the absence of such contract or agreement."  Ex. A., Section III - EXCLUSIONS, B. 3.  Accordingly, even assuming all other terms and conditions of the Policy are satisfied, coverage under Coverage C.3 is barred under this exclusion to the extent the claims in the Underlying Action are for contractual liability of Gavion under any express written contract or agreement, or for liability of others assumed by Gavion under any oral, written or implied contract or agreement (unless Gavion would have been liable in the absence of such contract or agreement).

65.     The Policy contains an exclusion stating that Everest will not pay for any **Loss** under any Insuring Agreement resulting from any **Claim** against an **Insured** "Based upon, attributable to, or arising out of the same facts, **Wrongful Acts** or **Interrelated Wrongful Acts** alleged or contained in any **Claim** which has been reported, or any circumstances of which notice has been given, under any insurance policy of which this policy is a direct or indirect renewal or replacement."  Ex. A., SECTION III- EXCLUSIONS, A. 4.  Accordingly, even assuming all other terms and conditions of the Policy are satisfied, coverage is barred under this exclusion to the

extent the Defendants gave notice of a Claim under any insurance policy replaced or renewed by the Policy at issue here that was based upon, attributable to, or arose out of the same facts, **Wrongful Acts** or **Interrelated Wrongful Acts** that resulted in the Claim against them in the Underlying Action.

66.    The Policy states that it is issued "in reliance upon all information provided to and statements made to [Everest], including those statements made in the **Application**, which is made part hereof and deemed attached hereto…."  Ex. A, p. 1 of 18.  **Application** means, in relevant part, "All materials and information, including all signed applications and any materials attached thereto or incorporated therein, submitted by or on behalf of the **Insureds** to the **Insurer** in connection with the **Insurer** underwriting this policy or any policy issued by the **Insurer** of which this policy is a direct or indirect renewal or replacement…."  Ex. A, SECTION II- DEFINITIONS, A.  As part of the application for coverage under the Policy, Everest received an XL Financial Services Liability Policy Renewal Application signed by the President of Gavion on August 25, 2014 containing the answer "No" to the following question under Item 11: "Have any claims such as would fall within the scope of the proposed insurance been made against any person(s) or entity(ies) proposed for this insurance?"  Bold-faced text following the question stated: **Without prejudice to any other rights and remedies of the Insurer, any Claim arising from any claims, facts, circumstances or situations required to be disclosed in response to Item 11 above is excluded from the proposed insurance."**  Everest relied upon that information, which formed part of the Defendants' **Application**, when issuing the Policy.  To the extent the claims against the Defendants in the Underlying Action arise from any facts, circumstances or situations they failed to disclose in their Application, coverage is barred in whole or in part under the Policy for those claims.

67.     The Policy defines **Loss**, in relevant part, as excluding "[m]atters uninsurable under the law pursuant to which this policy is construed," with the exception of **Claim Expenses** related thereto.  Ex. A., Section II - DEFINITIONS, P.  Accordingly, even assuming all other terms and conditions of the Policy are satisfied, pursuant to the definition of **Loss,** coverage for the claims against the Defendants in the Underlying Action are barred, in whole or in part, to the extent any of the matters for which Defendants are seeking coverage are determined to be uninsurable under the law pursuant to which the Policy is construed.

68.     The Policy defines **Loss**, in relevant part, as including punitive, exemplary or multiple damages and civil penalties, but only to the extent they are determined to be insurable "under the internal laws of any applicable jurisdiction most favorable to the **Insureds**, including without limitation the jurisdiction in which the **Insured Entity**, the **Insured Persons**, the **Insurer**, this policy or such **Claim** is located."  Ex. A., Section II - DEFINITIONS, P.  Accordingly, even assuming all other terms and conditions of the Policy are satisfied, pursuant to the definition of **Loss,** coverage for the claims against the Defendants in the Underlying Action are barred, in whole or in part, to the extent any punitive, exemplary or multiple damages and civil penalties are determined to be uninsurable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Everest National Insurance Company requests that a judgment be entered in its favor and against Defendants, and requests this Court to enter an Order:

1.     Determining, deciding, declaring and adjudicating that there is no coverage under the Policy issued by Everest National Insurance Company for the claims against the Defendants in the Underlying Action.

2.      Determining, deciding, declaring and adjudicating that Everest National Insurance Company has no obligation under the Policy to pay any amounts to Gavion, LLC, Miles S. Fortas, Brian L. Jones or Robert A Longfield, Jr. in connection with any of the claims asserted against them in the Underlying Action including, but not limited to, any judgments, settlements, attorneys' fees, expenses, interest or penalties.

3.      Awarding Everest National Insurance Company all such other and further relief which this Court may deem proper and just.

Date:  June 2, 2016

Respectfully submitted,

By:      s/ Justin Joy   _____
         Justin Joy, Esq. (TN BPR No. 023722)
         Lewis, Thomason, King, Krieg & Waldrop, PC
         One Commerce Square
         29th Floor
         40 South Main
         Memphis, TN  38103
         Tel: 901-525-8721
         Fax: 901-525-6722
         jjoy@lewisthomason.com

         Michael J. Smith, Esq. (*pro hac vice pending*)
         Bryan W. Petrilla, Esq. (*pro hac vice pending*)
         Stewart, Bernstiel, Rebar & Smith
         470 Norristown Road, Suite 201
         Blue Bell, Pennsylvania 19422
         Tel.: 484-344-5320
         Fax: 484-344-5341
         msmith@sbrslaw.com
         bpetrilla@sbrslaw.com

         Attorneys for Plaintiff
         Everest National Insurance Company